FILED

2013 Mar-29  PM 01:06
U.S. DISTRICT COURT
N.D. OF ALABAMA



## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | |
|---|---|
| **ELIZABETH BELL, individually and as Executrix of the Estate of Joe Louis Bell,**　　　　　　) ) ) )<br><br>**Plaintiff,**　) )<br>**v.**　) ) )<br>**CITY OF YORK, ALABAMA; DAVID ROWRY, individually and as Chief of York Police Department,**　) ) ) )<br>**Defendants.**　) | **CASE NO. 7:09-CV-0694-SLB** |

## <u>MEMORANDUM OPINION</u>

This case is presently pending before the court on plaintiff's Motion for Partial Summary Judgment, (doc. 75),[1] defendant City of York's Motion for Summary Judgment, (doc. 78), and defendant David Rowry's Motion for Summary Judgment, (doc. 79). Plaintiff, Elizabeth Bell, has sued defendants, David Rowry and the City of York, alleging they wrongfully caused the death of her husband, Joe Louis Bell. Upon consideration of the record, the submissions of the parties, and the relevant law, the court is of the opinion that Mrs. Bell's Motion for Partial Summary Judgment, (doc. 75), is due to be denied; the City's Motion for Summary Judgment, (doc. 78), is due to be granted in part and denied in part; and

---

[1]Reference to a document number, ["Doc. ____"], refers to the number assigned to each document as it is filed in the court's record.

Rowry's Motion for Summary Judgment, (doc. 79), is due to be granted in part and denied in part.

## I.  SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(a), summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  Once the moving party has met its burden, the non-moving party must go beyond the pleadings and show that there is a genuine issue of fact for trial.  *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986).   A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
>> (A)  citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>>
>> (B)  showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1); *see also Clark*, 929 F.2d at 608 ("it is never enough simply to state that the non-moving party cannot meet its burden at trial").

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "[C]ourts are required to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007)(quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)(per curiam)). Nevertheless, the non-moving party "need not be given the benefit of every inference but only of every reasonable inference." *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999)(citing *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988)); *see also Scott*, 550 U.S. at 380 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

"The applicable Rule 56 standard is not affected by the filing of cross-motions for summary judgment." *Godard v. Alabama Pilot, Inc.*, 485 F. Supp. 2d 1284, 1291 (S.D. Ala. 2007) (citing *Gerling Global Reinsurance Corp. of America v. Gallagher*, 267 F.3d 1228, 1233 (11th Cir. 2001)). "Where, as here, the parties file cross-motions for summary judgment, a court 'must consider each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law.'" *Bio-Medical Applications of Georgia, Inc. v. City of Dalton*, 685 F. Supp. 2d 1321, 1327 (N.D. Ga. 2009) (quoting *Rossignol v. Voorhaar,* 316 F.3d 516, 523 (4th Cir.2003)). "Cross-motions for

summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) (internal quotations).

## II.  MRS. BELL'S MOTION FOR PARTIAL SUMMARY JUDGMENT

## A.  STATEMENT OF FACTS[2]

Rowry was hired as a police officer by the City of York, Alabama, in 2005. (Doc. 78-5 at 22.)[3]  Previously, Rowry had worked for the Sumter County Sheriff's Department. (Doc. 78-6 at 5.)  His personnel file from the Sumter County Sheriff's Department contains two disciplinary write-ups for insubordination. (*Id*. at 2, 3.)

Shortly after the City hired Rowry, the Chief of Police of York died; the City Council and the Mayor appointed Rowry to be the Acting Chief of Police. (Doc. 78-1 at 27.)  Later, Rowry submitted his application for the Chief of Police position and the Mayor and the City Council named him Chief of Police. (*Id*. at 28-30.)  Nothing in the record indicates that Rowry was accused of excessive force or otherwise violating citizens' civil rights while with the York Police Department at any time before September 18, 2008.

---

[2]As required when determining a Motion for Summary Judgment, the court has construed the facts in the light most favorable to defendants, the non-moving parties.  All disputed facts are resolved in their favor, and all reasonable inferences arising from those facts are drawn in their favor.  *Scott*, 550 U.S. at 378.

[3]Except for depositions, references to page numbers refers to the page numbers assigned by the court's CM/ECF electronic filing system.  Depositions are cited to the page number in the original deposition.

On Tuesday, August 19, 2008, Mr. Bell entered the office of the *Sumter County Record Journal* in Livingston, Alabama, wanting to submit a letter to the editor to be published in that week's newspaper.  (Doc. 78-4 at 7-8.)  The publisher of the *Journal*, Tommy McGraw, informed Mr. Bell that it was past the deadline to run in that week's paper.  (*Id*. at 8.)  The letter also contained references to Mayor Carolyn Mitchell-Gosa, and McGraw wanted to check with the newspaper's attorney to be sure that the paper would not have any liability for printing the letter.  (*Id*. at 8-9.)  McGraw testified that, after he told Mr. Bell his letter would not be in that week's newpaper,

> [Mr. Bell's] voice became louder, and . . . I believe he started accusing me of supporting Mayor Gosa.  I told him that [the newspaper] did not endorse any political candidate. . . .  He became louder, [and] disagreeable.  Then he began to cuss, called me a mother fucker, said he was going to fuck me up and fuck everybody else up in the room or in the newspaper.  He was going to fuck The Record Journal up.  I took it as a threat that he was going to harm me.  I asked him to leave about five times.  He stepped toward me, [and] was just within inches of my face.

(*Id*. at 9.)  McGraw and other employees of the newspaper called the police, at which time Mr. Bell left the building.  (*Id*. at 9-10.)

Several days later, McGraw went to the Court Magistrate in Livingston and signed three warrants for Mr. Bell's arrest, and Mr. Bell was arrested.  (*Id*. at 10, 13.)

On September 11, 2008, McGraw stopped for gas at the Jr. Food Mart in York.  (*Id*. at 12-13.)  When he entered the store, he saw Mr. Bell talking to a store employee.  (*Id*. at 13.)  According to McGraw, Mr. Bell began questioning him about why McGraw had had him arrested.  (*Id*.)  McGraw testified:

> I said, "I signed a warrant because you threatened to fuck me up and fuck [up] everybody else that worked at The Record Journal . . . .  And I took that as a threat and that's the reason I signed the warrant."  He continued to curse and said the policeman who came to arrest him didn't even check him because he had a pistol in his pants and that they did not discover that, and he said the next time I [sent] an officer to have him arrested, that he was going to blow [his] mother fucking brains out.  And at that point, I turned to leave the building, and he said, "And then I'm going to blow your fucking brains out."  And I left the building.

(*Id*. at 13-14.)  Mr. Bell told McGraw, "I had a dream about killing you."  (Doc. 89 at 34.)

Mrs. Bell contends that Cedric Bell, a Sumter County Deputy Sheriff who witnessed part of the encounter at the Jr. Food Mart, said Mr. Bell had accused McGraw of lying, but Mr. Bell had not threatened McGraw.[4]  (*Id*. at 7.)  She also contends that Deputy Bell testified that McGraw "exaggerates everything." (*Id* at 8-9.)  Deputy Bell gave a statement to the Sumter County Sheriff's Office on September 26, 2008, in which he recounted the Jr. Food Mart incident.  (*Id*. at 34.)  He stated:

> I (Deputy Bell) was in the Jr. Food Mart buying a soda.  Joe Bell and [the] cashier . . . [were] talking . . . .  At that time, Mr. McGraw came into the store, spoke . . . and started walking toward the back of the store.  Joe Bell said, "Don't speak to me."  Mr. McGraw walk[ed] to the front of the store by the cash register and ask[ed] Mr. Bell why.  Mr. Bell said, "Don't say a mother fucking thing to me" . . . .  Mr. McGraw ask[ed] why again.  Mr. Bell said, "You [know] what, I had a dream about killing you (Mr. McGraw).  Mr. McGraw said, "Why do you [want] to kill me."  Mr. Bell said about all those lies you . . . . put in the newspaper."  Mr. McGraw said, "What lies[?]  It was the truth."  Mr. Bell [began] to get upset.  I (Deputy Cedric Bell) step[ped] in and talk[ed] with Mr. McGraw and told him to just leave it alone, because you [know] where this is going.  Mr. McGraw still was trying to talk with Mr. Bell.  At that time I . . . left the store.

---

[4]The court notes that this evidence is hearsay.

6

(*Id.*)

In his statement, Deputy Bell did not accuse McGraw of exaggeration. (*Id*.)  He did not state that Mr. Bell had "accuse[d] McGraw of lying when he made the accusations that led to [Mr. Bell's arrest]." (*Id*. at 7, 34.)  According to Deputy Bell, Mr. Bell accused McGraw of putting lies in the newspaper. (*Id*. at 34.)  Although Deputy Bell did not report that Mr. Bell threatened to blow McGraw's brains out, he did state that, when he left the store, Mr. Bell and McGraw were still talking. (*Id*.)  The court finds that McGraw's version of the events, that Mr Bell threatened him as he was leaving the Jr. Food Mart, is not disputed by Deputy Bell's statement.  Nevertheless, even if the court assumed that McGraw made up the entire encounter with Mr. Bell in the Jr. Food Mart, Mrs. Bell has not submitted any evidence to dispute McGraw's testimony that he reported to Rowry that Mr. Bell had threatened to kill any police officer that tried to arrest him and then to kill McGraw.

The following day, McGraw told a Livingston police officer about the incident, and told him to warn the Chief of Police for Livingston and the other police officers. (Doc. 78-4 at 14.)  A day or two later, McGraw told the Sumter County Sheriff about Mr. Bell's threats. (*Id*. at 14-15.)  On September 16, 2008, McGraw told Rowry "that Mr. Bell had threatened to blow the fucking brains out of the next police officer that came to arrest him, and [McGraw] warned [Rowry] that he needed to be careful." (*Id*. at 15.)  According to McGraw, Rowry told him that it appeared that Mr. Bell was growing more agitated. (*Id.*)  Rowry asked McGraw to come to York to sign a warrant, and McGraw indicated that he

would come back to York on Thursday or Friday.  (*Id.* at 16.)  He did not sign another warrant before Rowry shot Mr. Bell on Thursday, September 18, 2008.  (*Id.*)

Around noon on September 18, 2008, Clara Pearce and Mr. Bell were having lunch at the Church's Chicken restaurant in York.  (Doc. 78-8 at 1.)  Shortly after Ms. Pearce arrived at the restaurant, Rowry entered the restaurant and approached Mr. Bell.  (*Id.* at 2.) Rowry went to the restaurant to arrest Mr. Bell for stalking.[5]  (Doc. 77-1 at 2.)

In his statement to the ABI given on the day of the shooting, Rowry said, "I had decided to arrest [Mr.] Bell [and] take him to the [Police Department] and have a warrant for menacing.  I was also going to have . . . McGraw sign a warrant for menacing."  (*Id.*) "Menacing" is a misdemeanor under Alabama law.  Ala. Code § 13A-6-23(b).  Alabama prohibits its police officers from arresting an individual for a misdemeanor offense without a warrant unless the offense is committed in the officer's presence.  *See* Ala. Code § 15-10-3(a), Ala. R. Crim. P. 4.1(a)(1).

Rowry testified at his criminal trial that he had intended to arrest Mr. Bell for stalking, a felony, Ala. Code § 13A-6-90(b), based on the incident with McGraw at the Jr. Food Mart. (Doc. 81-1 at 9, 22.)  He explained the reference to menacing in his ABI statement: "[W]hen [Mr. Bell] pushed me and tried to take my gun, that's [when] the menacing charge came in.

---

[5]For purposes of deciding Mrs. Bell's Motion for Summary Judgment, the court has assumed Rowry went to the restaurant to arrest Mr. Bell for stalking, a felony.  However, as set forth below, for purposes of deciding defendants' Motions for Summary Judgment, the court has  assumed Rowry went to the restaurant to arrest Mr. Bell for menacing, a misdemeanor.

You physically touch somebody and threaten them, that's [when] the menacing comes in. . . . [T]hat's the charge that I was going to charge him." (*Id*. at 21.)

Rowry testified, "[A]fter I got into the Church's Chicken, [I] went to the table [where Mr. Bell and Pearce were eating] and [Mr. Bell] got up and pushed me, that's when I [drew] that gun.  When he pushed me, he pushed me back and I stepped back and that's when I [drew] that gun." (*Id*. at 24.)  He said, "I was backing back.  He was pushing me and grabbing at my gun.  Every time he would grab my gun, I would grab [it] back and snatch my hand." (*Id.* at 26.)  Mr. Bell's attempts to grab Rowry's weapon scared Rowry; he was afraid that, if Mr. Bell got his weapon, he would kill Rowry or someone else. (*Id*. at 28.)  Rowry testified that, after he stepped back,

> [Mr. Bell] was coming up on [Rowry].  He was coming up on [Rowry] a third
> time and he pulled . . . and grabbed [Rowry's] weapon. . . . [H]e caught the
> barrel of that gun.  [Rowry] felt a tug on that gun and [he] pulled back and
> walked back, made a step back.  And when [Mr. Bell] pulled that gun . . . and
> [Rowry] made a step back, that's when [Rowry] fired the gun because [he]
> knew that [Mr. Bell] was [going to] take that gun.

(*Id*.)  Some witnesses in the restaurant describe Mr. Bell as actively resisting arrest and pushing Rowry and grabbing for his gun. (Doc. 81-3 at 10, 15; doc. 81-4 at 7-8, 11-15; doc. 81-5 at 14-15, 18, 20.)  Rowry was 100 pounds lighter and 4-6 inches shorter than Mr. Bell. (Doc. 81-4 at 14; doc. 81-5 at 14.)  Mr. Bell was unarmed at the time of the shooting. (Doc. 78-8 at 2.)

Rowry notified the York Police Department that he had shot Mr. Bell and he needed an ambulance.  (*Id*.)  Mr. Bell was transported to the hospital where he was pronounced dead. (*Id*.)

Immediately after the shooting, the City notified the Sumter County Sheriff's Department and the ABI.  (Doc. 78-1 at 38-40.)  The Mayor and the City Council placed Rowry on administrative leave the following day.  (*Id*. at 42; doc. 78-2 at 24.)  The incident and shooting were investigated by the ABI, and subsequently turned over to the Seventeenth Judicial Circuit District Attorney for prosecution.  (*See* doc. 78-8 at 1-2.)

Rowry was charged with manslaughter in the death of Mr. Bell and, following a jury trial, he was found guilty.  (*See* doc 45; *see also* doc. 77-1 at 16.)  He appealed his conviction, which was affirmed by the Alabama Court of Criminal Appeals; his petition for writ of certiorari was denied by the Alabama Supreme Court.

## B. DISCUSSION

### 1. Federal Claims Against Rowry

#### a. Section 1983 – Fourth Amendment/False Arrest

In her First Amended Complaint, Mrs. Bell alleges, "Defendant Carolyn Mitchell-Gosa [then Mayor of the City of York] had ordered Chief of Police Rowry to arrest the Decedent illegally since there was no arrest warrant nor a crime being committed in the presence of Defendant Rowry when Decedent was shot dead."  (Doc. 4 at ¶ 22.)  She claims, "Defendant Rowry . . . violated the Fourth Amendment rights of [Mr. Bell] by attempting to

arrest him without probable cause to believe he had committed the felony of stalking." (Doc. 75 ¶ 1.) In her Brief in Support of her Motion for Summary Judgment, she argues that Rowry lacked arguable probable cause to arrest Mr. Bell for menacing or stalking. Specifically, Mrs. Bell contends:

> It is self-evident that the incident between [Mr.] Bell and McGraw that led Rowry to arrest Bell could not, under any rational reading of the statute, constitute stalking. By McGraw's account, the second encounter was by sheer happenstance. While related to the first incident in that [Mr.] Bell allegedly made reference to it, there was no pattern to Bell's alleged behavior. Clearly, the crime of stalking involves repeated, similar conduct, not two isolated instances, nearly a month apart, involving the same individuals.

> Regardless, the only conceivable way to treat Rowry's statement to the ABI, in which he said he intended to arrest [Mr.] Bell for menacing, as consistent with his trial testimony is to assume that he considered the alleged menacing, taken together with the prior incident sufficient to constitute stalking. However, one must assume that he determined that, on the second occasion, [Mr.] Bell was possibly guilty of menacing, not harassment, two separate offenses in Alabama with distinct elements. Rowry, if he believed [Mr.] Bell may have been guilty of menacing could not use that offense as the basis for charging Bell with repeated instances of harassment. One must assume that, if the Alabama legislature used a term ["]harassment["] in one section of its criminal code that was specifically defined as a crime in another, it intended to refer to that specific crime.

(Doc. 76 at 11-12.)[6]

The Eleventh Circuit has rejected Mrs. Bell's argument that a warrantless arrest for a misdemeanor not committed in the presence of the officer, in violation of Alabama law,

---

[6]In his Motion for Summary Judgment, Rowry contends that Mrs. Bell has not alleged a § 1983/false arrest claim against him. (*See* doc. 80 at 29-30.) For purposes of deciding Mrs. Bell's Motion for Summary Judgment, the court assumes the Amended Complaint contains such a claim.

violates the arrestee's Fourth Amendment right to be free from unreasonable seizure when the officer has probable cause. *See Crosby v. Monroe County*, 394 F.3d 1328, 1333 (11th Cir. 2004)(citing, *inter alia*, *Knight v. Jacobson*, 300 F.3d 1272, 1275-76 (11th Cir. 2002). The court stated:

> [Plaintiff] argues that, even if there was probable cause, his arrest was still a violation of the Fourth Amendment.  He points out that reckless endangerment is a misdemeanor, *see* Ala.Code § 13A-6-24(b), and Alabama law does not permit a warrantless arrest for a misdemeanor unless it occurred in the officer's presence, *see Telfare v. City of Huntsville*, 841 So. 2d 1222, 1228-29 (Ala. 2002).  We rejected a materially identical contention in *Knight v. Jacobson*, 300 F.3d 1272, 1275-76 (11th Cir. 2002), and that decision requires that we do the same here.

*Id*.  An arrest which is supported by probable cause – even if not permitted under state law – does not violate the Fourth Amendment.  *Knight*, 300 F.3d at 1276.

"Under the Fourth Amendment, an individual has a right to be free from 'unreasonable searches and seizures[,]' and an arrest is a seizure of the person." *Case v. Eslinger*, 555 F.3d 1317, 1326 (11th Cir. 2009) (quoting *Skop v. City of Atlanta*, 485 F.3d 1130, 1137 (11th Cir. 2007)).  The existence of probable cause determines the reasonableness of an arrest under the Fourth Amendment.  *Id*.  "A warrantless arrest without probable cause violates the Constitution and provides a basis for a section 1983 claim, but the existence of probable cause at the time of arrest constitutes an absolute bar to a section 1983 action for false arrest." *Id*. at 1326-27 (quoting *Kingsland v. City of Miami*, 382 F.3d 1220, 1226 (11th Cir. 2004))(quotations and alteration omitted); s*ee also Von Stein v. Brescher*, 904 F.2d 572,

579 (11th Cir. 1990)("[A]n arrest without probable cause to believe a crime had been committed violate[s] the Fourth Amendment.").

"Probable cause to arrest exists when law enforcement officials have facts and circumstances within their knowledge sufficient to warrant a reasonable belief that the suspect had committed or was committing a crime." *Case*, 555 F.3d at 1327 (quoting *United States v. Gonzalez*, 969 F.2d 999, 1002 (11th Cir. 1992)); *see also Lee v. Ferraro*, 284 F.3d 1188, 1195 (11th Cir. 2002)(requiring that arrest be objectively reasonable based on the totality of the circumstances).  "When the constitutional validity of an arrest is challenged, it is the function of the court to determine whether the facts available to the arresting officers at the moment of the arrest support a finding of probable cause."  *United States v. Allison*, 953 F.2d 1346, 1350-51 (11th Cir. 1992).  The Supreme Court has held, "Our cases make clear that an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause.  That is to say, his subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause." *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004)(citing, *inter alia*, *Wren v. United States*, 517 U.S. 806, 812-813 (1996))(internal citations omitted).  Therefore, in deciding Mrs. Bell's Motion for Summary Judgment on her § 1983/false arrest claim, the court will consider whether Rowry had probable cause to arrest Mr. Bell for any offense.

Rowry contends, "There can be no question based on the undisputed facts of this case that Rowry in good faith believed probable cause existed to arrest [Mr.] Bell on numerous

charges, including stalking and menacing." (Doc. 85 at 13.) Under the facts set forth above,

the court finds Rowry had arguable probable cause to arrest Mr. Bell based on the threats

made to McGraw during their second encounter for harassment in violation of Ala. Code §

13A-11-8(a)(1)(b) and (2), and stalking in violation of Ala. Code § 13A-6-90(a).

Section 13A-8-11 provides:

(a)(1)  Harassment.  A person commits the crime of harassment if, with intent
to harass, annoy, or alarm another person, he or she . . . :

. . .

b.  Directs abusive or obscene language or makes an obscene gesture
towards another person.

(2)  For purposes of this section, harassment shall include a threat, verbal or
nonverbal, made with the intent to carry out the threat, that would cause a
reasonable person who is the target of the threat to fear for his or her safety.

Ala. Code § 13A-11-8(a)(1)-(2).  Rowry's knowledge of Mr. Bell's threat to blow McGraw's

"mother fucking brains out" after he had killed any police officer McGraw sent to arrest him,

under the circumstances, provided probable cause to arrest Mr. Bell for harassment.  A

reasonable officer, knowing the facts and circumstances known to Rowry, could have

reasonably believed that Mr. Bell had committed the offense of felony harassment based on

the reported obscene and threatening language he had directed to McGraw at the Jr. Food

Mart.

Rowry also had probable cause to arrest Mr. Bell for stalking.  "A person who

intentionally and repeatedly follows or harasses another person and who makes a threat,

either expressed or implied, with the intent to place that person in reasonable fear of death or serious bodily harm is guilty of the crime of stalking in the first degree." Ala. Code § 13A-6-90(a). Stalking in the first degree is a felony. *Id*. (b). As used in § 13A-6-90(a), the term "harasses" means "Engages in an intentional course of conduct directed at a specified person which alarms or annoys that person . . . and which serves no legitimate purpose. The course of conduct must be such as would cause a reasonable person to suffer substantial emotional distress, and must actually cause substantial emotional distress." Ala. Code § 13A-6-92(c).

Rowry had information that, after being arrested for disorderly conduct, criminal trespass, and harassment based on warrants signed by McGraw, Mr. Bell again threatened McGraw, stating that he would kill McGraw and he would kill any officer McGraw sent to arrest Mr. Bell. This was Mr. Bell's second threat to harm McGraw. Under the circumstances, a reasonable officer, knowing the facts and circumstances known to Rowry, could have reasonably believed that Mr. Bell had committed the offense of stalking, a felony, against McGraw.

Rowry also had probable cause to arrest Mr. Bell for menacing, in violation of Ala. Code § 13A-6-23, based on his threats to McGraw at the Jr. Food Mart. "A person commits the crime of menacing if, by physical action, he intentionally places or attempts to place another person in fear of imminent serious physical injury." Ala. Code §13A-6-23(a).

Rowry's knowledge that Mr. Bell had threatened to kill McGraw if he sent another officer to arrest him provides probable cause to arrest Mr. Bell for menacing.

Because Rowry had probable cause to arrest Mr. Bell for harassment, stalking, and menacing, Mrs. Bell's § 1983 claim based on an alleged wrongful arrest in violation of the Fourth Amendment is absolutely barred. *See Case*, 555 F.3d at 1326-27. Therefore, her Motion for Partial Summary Judgment as to her § 1983/false arrest claim is due to be denied.

### b. Section 1983 – Fourth Amendment/Excessive Force

Mrs. Bell contends that she is entitled to judgment as a matter of law because "Rowry used excessive force in attempting to arrest [Mr.] Bell by shooting and killing him in violation of [Mr. Bell's] Fourth Amendment rights." (Doc. 75 at 2.) She contends:

> A state court jury convicted Rowry, beyond a reasonable doubt, of manslaughter. He was indicted and convicted of causing [Mr.] Bell's death "under circumstances that would constitute murder under Section 13A-6-2 (mitigated by) a sudden heat of passion caused by a provocation recognized by law and before a reasonable time for the passion to cool and for reason to reassert itself . . . (Ex. 8, p.16)."
>
> . . .
>
> Of course, Rowry's criminal conviction is not *res judicata* for this action. *Bredeson v. Croft*, 295 Ala. 246, 247, 326 So. 2d 735 (1976). Nevertheless, Rowry is collaterally estopped from interposing any defense to plaintiff's allegation of excessive force. . . .
>
> While the elements of manslaughter may be different from the elements of a claim of excessive force, the elements of the latter are subsumed in the former. Excessive force is, as it were, a lesser included "offense" to manslaughter. That issue was litigated in Rowry's criminal trial, was the essence of the prior action and was decided beyond a reasonable doubt. Thus, all the necessary elements to collaterally estop Rowry from defending the claim of excessive force are met.

16

(Doc. 76 art 12-14.)  In an unpublished opinion, *Sharpley v. Raley*, 153 Fed. Appx. 624

(2005),[7] the Eleventh Circuit has rejected Mrs. Bell's collateral-estoppel argument.

In *Sharpley*, the Eleventh Circuit held:

> [Sharpley] argues that Raley's state court conviction for manslaughter for his conduct in the shooting – a conviction that has been affirmed on appeal – collaterally estops him from denying liability in this civil lawsuit. The collateral estoppel effect of a state court judgment in federal court depends on the effect that the state's courts would give that judgment. *Allen v. McCurry*, 449 U.S. 90, 96 (1980). We are convinced that Alabama courts would not give Raley's manslaughter conviction collateral estoppel effect in this lawsuit if it were in state court.
>
> Alabama collateral estoppel law requires that the party seeking to benefit from a prior judgment be in privity with a party to the original case. *Jones v. Blanton*, 644 So. 2d 882, 886 (Ala. 1994). A party is defined as one whose legal interests would have been prejudiced from a contrary decision in the prior case. *See id.* ("unless both parties in a second action are bound by the judgment in a previous case, neither party in the second action should be bound"). One in privity with a party is one who shares the legal interests of that party in the prior proceeding. *See Hughes v. Martin*, 533 So. 2d 188, 191 (Ala. 1988). Mrs. Sharpley, the plaintiff here, was not a party in the criminal prosecution of Raley; her legal interests would not have been prejudiced if Raley had been acquitted. Nor is she in privity with the State of Alabama, the party on the prosecution side of the criminal case.
>
> Our decision in *Wood v. Kesler*, 323 F.3d 872, 880 & n.10 (11th Cir. 2003), is not to the contrary. In that case, collateral estoppel was asserted on behalf of the defendant, who had been the arresting officer in the prior criminal case on the ground that he had acted for the State in bringing the criminal proceeding. For that reason, we concluded that the officer in *Wood* was in privity with the State of Alabama, a formal party in the prosecution, and

---

[7]Eleventh Circuit Rule 36-2 provides, in pertinent part, "An opinion shall be unpublished unless a majority of the panel decides to publish it. ***Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority***." 11th Cir. R. 36-2 (emphasis added).

in that respect he shared a legal interest with it.  *See id.* ("Although State Trooper Kesler was not a party in the prior case, Kesler acted for the State in charging Wood with speeding in the prior case and shares an identity of interest with the State in the subject matter of the litigation.").  Because Mrs. Sharpley was not a party in the prosecution of Raley and is not in privity with the State of Alabama in that prosecution, she is not entitled to use the conviction to collaterally estop Raley from denying liability in the lawsuit she has brought against him.

*Sharpley*, 153 Fed. Appx. at 627-28 (parallel citations and footnote omitted).

Likewise, in this case, Mrs. Bell "was not a party in the prosecution of [Rowry] and [she] is not in privity with the State of Alabama in that prosecution;" therefore, "she is not entitled to use the conviction to collaterally estop [Rowry] from denying liability in the lawsuit she has brought against him."  *Sharpley*, 153 Fed. Appx. at 628.

Mrs. Bell's Motion for Partial Summary Judgment, based on the ground that Rowry's criminal conviction collaterally estops him from defending against the excessive force/Fourth Amendment claim, will be denied.

Mrs. Bell also contends, "[A]ny assertion by Rowry that, in effect, attacks the state court criminal conviction is barred by the *Rooker-Feldman* doctrine.  If the issue before this Court was raised in a state court proceeding and is 'inextricably linked' to the state court's judgment, it cannot be revisited and relitigated."  (Doc. 76 at 14 [citing *Datz v. Kilgore*, 51 F.3d 252, 253-254 (11th Cir. 1995)].)

The *Rooker-Feldman* doctrine does not bar Rowry's defense of Mrs. Bell's claims. "The *Rooker–Feldman* doctrine is confined to cases that, like *Rooker*[8] and *Feldman*,[9] were 'brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments.'" *Vasquez v. YII Shipping Co., Ltd.*, 692 F.3d 1192, 1195-96 (11th Cir. 2012)(quoting *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005))(emphasis deleted; footnotes added). This case was not "brought" by Rowry, he was not convicted in state-court "before the district court proceedings commenced," and he is not inviting "review" of his conviction. This case is clearly not within the *Rooker-Feldman* doctrine.

Mrs. Bell's Motion for Partial Summary Judgment based on the *Rooker-Feldman* doctrine is due to be denied.

Mrs. Bell contends that "the undisputed facts preclude any conclusion other than that Rowry used excessive force." (Doc. 76 at 14.) However, viewing the facts in the light most favorable to Rowry, as the court must do in deciding Mrs. Bell's Motion for Partial Summary Judgment, the facts are not so one-sided as to require a finding in favor of Mrs. Bell.

"The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the right to be free from excessive force during the course of a criminal

---

[8]*Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923).

[9]*District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983).

apprehension." *Oliver v. Fiorino*, 586 F.3d 898, 905 (11th Cir. 2009)(citing *Graham v. Connor*, 490 U.S. 386, 394 (1989)).  The right to arrest an individual carries with it the right to "use some degree of physical coercion or threat thereof to effect it." *Crenshaw v. Lister*, 556 F.3d 1286, 1290 (11th Cir. 2009)(quoting *Graham*, 490 U.S. at 396).

In determining whether an officer's use of force is excessive, "[t]he question is whether the officer's conduct is objectively reasonable in light of the facts confronting the officer." *Vinyard v. Wilson*, 311 F.3d 1340, 1347 (11th Cir. 2002)(citing *Graham*, 490 U.S. at 394).  The reasonableness of the use of force is measured objectively – that is, the use of force is "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham,* 490 U.S. at 397; *Crenshaw*, 556 F.3d at 1290.

> Because the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, however, its proper application requires careful attention to the facts and circumstances of each particular case, including [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight.

*Graham*, 490 U.S. at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)(quoting *United States v. Place*, 462 U.S. 696, 703 (1983)))(internal citations and quotations omitted).  The issue is whether Mr. Bell "would have appeared to reasonable police officers to have been gravely dangerous" at the time Rowry shot him.  *See Pace v. Capobianco*, 283 F.3d 1275, 1292 (11th Cir. 2002).

Viewing the facts in the light most favorable to Rowry, Mr. Bell actively resisted arrest.  He pushed Rowry and grabbed Rowry's gun.  Also, Rowry was aware that Mr. Bell

had told McGraw he was carrying a gun and that he would shoot to kill any officer that attempted to arrest him.  Under the circumstances, the court finds Rowry has presented sufficient evidence upon which a reasonable jury could find that the amount of force used was reasonable under the circumstances.

Therefore, Mrs. Bell's Motion for Partial Summary Judgment as to her § 1983 excessive force claim will be denied.

### 2.  Federal Claims Against the City

Mrs. Bell contends:

> The City of York . . . is liable for the constitutional wrongs perpetrated by Rowry because Rowry was York's policymaker for law enforcement matters when he shot and killed Bell and his decisions to arrest Bell, to do so on the time and at the place he chose, to do so without getting backup from other officers and to threaten and then use deadly force in attempting to effectuate the arrest all therefore constituted policies of the city.

(Doc.. 75 ¶ 5.)  For the reasons set forth in the court Order denying Mrs. Bell's Motion for Leave to Amend, (doc. 104), the court finds that Mrs. Bell has not stated a claim against the City based on the fact that Rowry was a final policymaker for the City.  Therefore, Mrs. Bell's Motion for Partial Summary Judgment on such a claim will be denied.  Mrs. Bell did not move for summary judgment on her § 1983 claim based on the City's hiring, training, supervision, and/or retention of Rowry.  (*See generally* doc. 75.)

### 3.  State-Law Claims

Mrs. Bell argues that she is entitled to summary judgment on her state-law claims against both defendants. (Doc. 76 at 26.)  Her Motion appears to be based on two grounds:

21

(1) the court should disregard Rowry's testimony at his criminal trial that he intended to arrest Mr. Bell for stalking, and (2) Rowry's decision to arrest Mr. Bell was the proximate cause of Mr. Bell's death.

The court finds that any inconsistency between Rowry's statement to the ABI and his subsequent criminal trial testimony, which Rowry explained during his criminal trial testimony, does not entitle plaintiff to judgment as a matter of law.  First, as stated above, Rowry's stated reason for attempting to arrest Mr. Bell is irrelevant to the issue of whether Rowry had probable cause.  *See Devenpeck*, 543 U.S. at 153; *see also Hamm v. Alabama*, 564 So. 2d 453, 462 (Crim. App. 1989)("When an officer makes an arrest, which is properly supported by probable cause to arrest for a certain offense, neither his subjective reliance on an offense for which no probable cause exists nor his verbal announcement of the wrong offense vitiates the arrest.")(quoting *Powell v. State*, 548 So. 2d 590, 600 (Ala. Crim. App. 1988)(quoting *United States v. Saunders*, 476 F.2d 5, 7 (5th Cir. 1973))), *aff'd* 564 So. 2d 469 (Ala.), *cert. denied* 498 U.S. 1008 (1990).  Second, even if the court assumes Rowry's statement regarding his subjective intent is relevant, his conflicting statements raise an issue of credibility for the finder of fact.  *See Tippens v. Celotex Corp.*, 805 F.2d 949, 953-54 (11th Cir. 1986).  However, for summary judgment purposes, the conflict must be resolved in Rowry's favor.  *See Scott*, 550 U.S. at 378 (when the facts are disputed, "courts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion")(internal citations and quotations omitted).

Mrs. Bell's Motion for Partial Summary Judgment based on Rowry's inconsistent statements will be denied.

Mrs. Bell also contends that she is entitled to summary judgment on her state-law claims – wrongful death, intentional tort, negligence, negligent failure to supervise and train, and a due process violation pursuant to the Alabama constitution – because "Rowry's decision to arrest [Mr.] Bell was a proximate cause of [Mr.] Bell's death." (Doc. 76 at 28.) Apparently, this argument is directed to defendants' contention that Mr. Bell's resistance to Rowry's attempt to arrest him broke the chain of causation between Rowry's attempted arrest and his subsequent decision to use deadly force. (*See* doc. 83 at 27-28; doc. 85 at 25-26.)

The Alabama Supreme Court has held:

> It is settled law in Alabama that even if one negligently creates a dangerous condition, he or she is not responsible for injury that results from the intervention of another cause, if at the time of the original negligence, the intervening cause cannot reasonably be foreseen. In such cases, we have held that the defendant's negligence is not the "proximate cause" of the plaintiff's injury, and, therefore, that the defendant is not liable. Such an unforeseen agency, which breaks the chain of causation that otherwise might have linked the defendant's negligence to the plaintiff's injury, has been referred to as an "intervening efficient cause." In order for conduct to be considered an intervening efficient cause, it must (1) occur after the defendant's negligent act, (2) be unforeseeable to the defendant at the time he acts, and (3) be sufficient to be the sole cause-in-fact of the plaintiff's injury.

*Prill v. Marrone*, 23 So. 3d 1, 6 (Ala. 2009)(internal citations and quotations omitted).

The record contains undisputed evidence that Rowry was aware Mr. Bell had threatened to kill any police officer that tried to arrest him. Rowry testified that Mr. Bell resisted arrest, shoved him, and grabbed his weapon. Under the circumstances, the court

23

finds no reasonable jury could find that Mr. Bell's resistance to being arrested was unforeseeable to Rowry at the time he attempted to arrest Mr. Bell. Therefore, Mr. Bell's resistance cannot be an intervening efficient cause sufficient to break the chain of causation between Rowry's attempt to arrest Mr. Bell and his use of deadly force.

Nevertheless, a finding of causation between Rowry's decision to arrest Mr. Bell and Mr. Bell's death does not entitle Mrs. Bell to summary judgment on her state-law claims against Rowry or the City. Questions of fact exist, including whether Rowry was justified in using deadly force and, if not, whether Rowry and/or the City are entitled to immunity under Alabama law. Therefore, the court finds, even though Rowry's decision to arrest Mr. Bell was a proximate cause of Mr. Bell's death, Mrs. Bell has not presented sufficient evidence to prove the material facts are undisputed and that she is entitled to judgment as a matter of law on her state-law claims.

Mrs. Bell's Motion for Partial Summary Judgment is due to be denied as to her Bell's state-law claims of wrongful death, intentional tort, negligence, negligent failure to supervise and train, and a violation of the due process clause of the Alabama Constitution.

## C. CONCLUSION

For the foregoing reasons, the court is of the opinion that there are material facts in dispute and Mrs. Bell is not entitled to judgment as a matter of law. An Order denying Mrs. Bell's Motion for Partial Summary Judgment, (doc. 75), will be entered contemporaneously with this Memorandum Opinion.

### III.  ROWRY'S MOTION FOR SUMMARY JUDGMENT

**A.  STATEMENT OF FACTS**[10]

Rowry was hired as a police officer by the City of York, Alabama, in 2005.  (Doc. 78-5 at 22.)  Previously, Rowry had worked for the Sumter County Sheriff's Department.  (Doc. 78-6 at 5.)  His personnel file from the Sumter County Sheriff's Department contains two disciplinary write-ups for insubordination.  (*Id*. at 2, 3.)

Shortly after the City hired Rowry, the Chief of Police of York died; the City Council and the Mayor appointed Rowry to be the Acting Chief of Police.  (Doc. 78-1 at 27.)  Later, Rowry submitted his application for the Chief of Police position and the Mayor and the City Council named him Chief of Police.  (*Id*. at 28-30.)  Nothing in the record indicates that Rowry was ever accused of excessive force or otherwise violating citizens' civil rights while with the York Police Department at any time before September 18, 2008.

On Tuesday, August 19, 2008, Mr. Bell entered the office of the *Sumter County Record Journal* in Livingston, Alabama, wanting to submit a letter to the editor to be published in that week's newspaper.  (Doc. 78-4 at 7-8.)  The publisher of the *Journal*, Tommy McGraw, informed Mr. Bell that it was past the deadline to run in that week's paper.  (*Id*. at 8.)  The letter also contained references to Mayor Carolyn Mitchell-Gosa, and

---

[10]As required when determining a Motion for Summary Judgment, the court has construed the facts in the light most favorable to Mrs. Bell, the non-moving party.  All disputed facts are resolved in her favor, and all reasonable inferences arising from those facts are drawn in her favor.  *Scott*, 550 U.S. at 378.

McGraw wanted to check with the newspaper's attorney to be sure that the paper would not

have any liability for printing the letter. (*Id*. at 8-9.) McGraw testified that, after he told Mr.

Bell his letter would not be printed in that week's newspaper,

> [Mr. Bell's] voice became louder, and . . . I believe he started accusing
> me of supporting Mayor Gosa. I told him that [the newspaper] did not endorse
> any political candidate. . . . He became louder, [and] disagreeable. Then he
> began to cuss, called me a mother fucker, said he was going to fuck me up and
> fuck everybody else up in the room or in the newspaper. He was going to fuck
> The Record Journal up. I took it as a threat that he was going to harm me. I
> asked him to leave about five times. He stepped toward me, [and] was just
> within inches of my face.

(*Id*. at 9.) McGraw and other employees of the newspaper called the police, at which time

Bell left the building. (*Id*. at 9-10.)

Several days later, McGraw went to the Court Magistrate in Livingston and signed

three warrants for Mr. Bell's arrest, and Mr. Bell was arrested. (*Id*. at 10, 13.)

On September 11, 2008, McGraw stopped for gas at the Jr. Food Mart in York. (*Id*.

at 12-13.) When he entered the store, he saw Mr. Bell talking to a store employee. (*Id*. at

13.) According to McGraw, Mr. Bell began questioning him as to why McGraw had had him

arrested. (*Id*.) McGraw testified:

> I said, "I signed a warrant because you threatened to fuck me up and fuck
> everybody else that worked at The Record Journal up. And I took that as a
> threat and that's the reason I signed the warrant." He continued to curse and
> said the policeman who came to arrest him didn't even check him because he
> had a pistol in his pants and that they did not discover that, and he said the next
> time I [sent] an officer to have him arrested, that he was going to blow [his]
> mother fucking brains out. And at that point, I turned to leave the building,
> and he said, "And then I'm going to blow your fucking brains out." And I left
> the building.

26

(*Id.* at 13-14.)  Mr. Bell told McGraw, "I had a dream about killing you."  (Doc. 89 at 34.)

Mrs. Bell contends that Cedric Bell, a Sumter County Deputy Sheriff who witnessed part of the encounter at the Jr. Food Mart, said that Mr. Bell had accused McGraw of lying, but Mr. Bell had not threatened McGraw at the Jr. Food Mart.[11]  (*Id.* at 7.)  She also contends that Deputy Bell testified that McGraw "exaggerates everything."  (*Id* at 8-9.)  Deputy Bell gave a statement to the Sumter County Sheriff's Office on September 26, 2008, in which he recounted the Jr. Food Mart incident.  (*Id.* at 34.)  He stated:

> I (Deputy Bell) was in the Jr. Food Mart buying a soda.  Joe Bell and [the] cashier . . . [were] talking . . . .  At that time, Mr. McGraw came into the store, spoke . . . and started walking toward the back of the store.  Joe Bell said, "Don't speak to me." Mr. McGraw walk[ed] to the front of the store by the cash register and ask[ed] Mr. Bell why.  Mr. Bell said, "Don't say a mother fucking thing to me" . . . .  Mr. McGraw ask[ed] why again.  Mr. Bell said, "You [know] what, I had a dream about killing you (Mr. McGraw).  Mr. McGraw said, "Why do you [want] to kill me."  Mr. Bell said about all those lies you . . . . put in the newspaper."  Mr. McGraw said, "What lies[?]  It was the truth."  Mr. Bell [began] to get upset.  I (Deputy Cedric Bell) step[ped] in and talk[ed] with Mr. McGraw and told him to just leave it alone, because you [know] where this is going.  Mr. McGraw still was trying to talk with Mr. Bell.  At that time I . . . left the store.

(*Id.*)

In his statement, Deputy Bell did not accuse McGraw of exaggeration.  (*Id.*)  He did not state that Mr. Bell had "accuse[d] McGraw of lying when he made the accusations that led to [Mr. Bell's arrest]."  (*Id.* at 7, 34.)  According to Deputy Bell, Mr. Bell accused McGraw of putting lies in the newspaper.  (*Id.* at 34.)  Although Deputy Bell did not report

---

[11]See, *supra*, note 4.

that Mr. Bell threatened to blow McGraw's brains out, he did state that when he left the store,

Mr. Bell and McGraw were still talking.  (*Id*.)  The court finds that McGraw's version of the

events, that Mr Bell threatened him as he was leaving the Jr. Food Mart, is not disputed by

Deputy Bell's statement.  Nevertheless, even if the court assumed that McGraw made up the

entire encounter with Mr. Bell in the Jr. Food Mart, Mrs. Bell has not submitted any evidence

to dispute McGraw's testimony that he reported to Rowry that Mr. Bell had threatened to kill

any police officer that tried to arrest him and then to kill McGraw.

The following day, McGraw told a Livingston police officer about the incident, and

told him to warn the Chief of Police for Livingston and other Livingston police officers.

(Doc. 78-4 at 14.)  A day or two later, McGraw told the Sumter County Sheriff about Bell's

threats.  (*Id*. at 14-15.)  On September 16, 2008, McGraw told Rowry "that Mr. Bell had

threatened to blow the fucking brains out of the next police officer that came to arrest him,

and [McGraw] warned [Rowry] that he needed to be careful."  (*Id*. at 15.)  According to

McGraw, Rowry told him that it appeared that Mr. Bell was growing more agitated.  (*Id.*)

Rowry asked McGraw to come to York to sign a warrant, and McGraw indicated that he

would come back to York on Thursday or Friday.  (*Id*. at 16.)  He did not sign another

warrant before Mr. Bell was shot on Thursday, September 18, 2008.  (*Id*.)

Around noon on September 18, 2008, Clara Pearce and Mr. Bell were having lunch

at the Church's Chicken restaurant in York.  (Doc. 78-8 at 1.)  Shortly after Ms. Pearce

arrived at the restaurant, Rowry entered the restaurant and approached Mr. Bell.  (*Id*. at 2.)

28

Rowry went to the restaurant to arrest Mr. Bell for menacing.[12] (Doc. 77-1 at 2.) At the time,

there were no active warrants for Mr. Bell's arrest. (Doc. 78-8 at 2.) Viewing the facts in

the light most favorable to Mrs. Bell, the court finds, for purposes of summary judgment, that

Rowry entered the restaurant with his weapon drawn.[13] (*See id.*)

According to Pearce's statement to the ABI, the following occurred:

The Chief came into the [restaurant] in a hurry. The Chief went toward the
counter, then turned around and went around to the table where [Pearce] and
Joe Bell were sitting. The Chief . . . (in uniform) . . . pointed [his weapon] at
Joe Bell and shouted, "You are under arrest." [Mr. Bell] asked "for what?"
The Chief yelled, "You are under arrest" again. [Mr. Bell] stood up at this
point and stated, "You are going to arrest me . . . for what?" The Chief pushed
[Mr. Bell] with his right hand [and Mr. Bell] push[ed] . . . back and [Rowry]
stated, "You're under arrest" very loudly. [Mr. Bell] asked again "For what?"
The Chief pushed [Mr. Bell] again with his right hand. . . . Right after the
second push, the Chief put both hands on the gun and shot [Mr. Bell] in the
left chest region. [Mr. Bell] fell to the floor. The Chief again said, "You're
under arrest." The Chief pulled his cuffs out, put his gun in the holster and
cuffed [Mr. Bell] . . . . While the Chief was cuffing [Mr. Bell], Clara Pearce
called '911.'

(Doc. 89 at 36.)[14] Mr. Bell was unarmed at the time of the shooting. (Doc. 78-8 at 2.)

---

[12]See, *supra*, note 5.

[13]In his sworn statement to the ABI, Rowry stated that he "went to the door" of the
restaurant "and pulled [his] pistol." (Doc. 77-1 at 2.) This fact is disputed by testimony of
witnesses to the shooting that reported Rowry pulled his weapon after he told Mr. Bell he
was under arrest. (*See* doc. 81-3 at 10; doc. 81-4 at 14; doc. 81-5 at 10, 14; doc. 89 at 36.)
However, for purposes of deciding defendants' Motions for Summary Judgment the court
assumes Rowry entered the restaurant with his weapon drawn.

[14]The circumstances surrounding the shooting are disputed. Rowry testified that Mr.
Bell had grabbed his weapon before he fired. (Doc. 81-1 at 28.) Also, some witnesses
describe Mr. Bell as actively resisting arrest and pushing Rowry and grabbing for his gun.
(Doc. 81-3 at 10, 15; doc. 81-4 at 13; doc. 81-5 at 18.) However, for purposed of deciding

Rowry notified the York Police Department that he had shot Mr. Bell and he needed an ambulance.  (*Id.*)  Mr. Bell was transported to the hospital where he was pronounced dead.  (*Id.*)

Immediately after the shooting, the City notified the Sumter County Sheriff's Department and the ABI.  (Doc. 78-1 at 38-40.)  The Mayor and the City Council placed Rowry on administrative leave the following day.  (*Id.* at 42; doc. 78-2 at 24.)  The shooting was investigated by the ABI, and subsequently turned over to the Seventeenth Judicial Circuit District Attorney for prosecution.  (*See* doc. 78-8 at 1-2.)

Rowry was charged with manslaughter in the death of Mr. Bell and, following a jury trial, he was found guilty.  (*See* doc 45; *see also* doc. 77-1 at 16.)  He appealed his conviction, which was affirmed by the Alabama Court of Criminal Appeals; his petition for writ of certiorari was denied by the Alabama Supreme Court.

## B.  DISCUSSION

### 1.  Federal Claims

#### a.  Causation

Rowry argues, "Pursuant to the Alabama Wrongful Death Statute, Plaintiff's constitutional claims do not survive the death of [Mr.] Bell because the alleged wrongful conduct did not cause his death.  [Mr.] Bell resisted arrest and attacked Rowry, causing his

---

defendants' Motions for Summary Judgment the court assumes the facts are as set forth in Pearce's statement.

own death.  Thus, summary judgment should be granted in favor of Rowry on all of Plaintiff's federal claims."  (Doc. 80 at 18.)

Section 1983 states, "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution . . . shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ."  42 U.S.C. § 1983.  "[S]ection 1983 requires proof of an affirmative causal connection between the official's acts or omissions and the alleged constitutional deprivation."  *Zatler v. Wainwright*, 802 F.2d 397, 401 (11th Cir. 1986).  "A causal connection may be established by proving that the official was personally involved in the acts that resulted in the constitutional deprivation."  *Id*.

The court finds, as a matter of law and for § 1983 purposes, Rowry's actions caused Mr. Bell's death.  Mr. Bell's resistance to being arrested was not an intervening cause sufficient to break the chain of causation between Rowry's alleged use of deadly force and Mr. Bell's death.  *See Troupe v. Sarasota County*, 419 F.3d 1160, 1165-66 (11th Cir. 2005).[15]  Although Rowry's testimony describing Mr. Bell's reaction to Rowry's attempted

———————————————

[15]The Eleventh Circuit held:

> For the following reasons, we conclude that the district court did not err in [determining that the decedent's continued flight after being shot by defendant police officer, Bauer, constituted an independent "intervening" cause].  First, Gooding[, another police officer,] fired only one shot and it completely missed striking the car or any of its passengers.  Thus, Gooding's

31

arrest, if believed, would support a finding that the amount of force Rowry used was reasonable, such a finding would not break the chain of causation between Rowry's attempt to arrest Mr. Bell and Mr. Bell's death.

Therefore, Rowry's Motion for Summary Judgment, seeking to dismiss Mrs. Bell's § 1983 claims on the ground that Rowry did not cause Mr. Bell's death, is due to be denied.

### b. Qualified Immunity

Rowry contends that he is entitled to qualified immunity as to Mrs. Bell's § 1983 claims.

When government officials act in a way that knowingly violates a clearly established statutory or constitutional right of which a reasonable person

---

single-missed shot was not the proximate cause of any injury to [the passengers in decedent's car.] [The decedent's] decision to continue his flight and his continued exercise of control over the [car] after he was shot, was the intervening cause of [the passengers'] injuries. The fact that [the decedent] ultimately died from the gunshot wound fired by Bauer does not erase the acts and decisions that [the decedent] made after the shooting and up to the time of his death. "The causal relation does not exist when the continuum between Defendant's action and the ultimate harm is occupied by the conduct of deliberative and autonomous decision-makers." *Dixon v. Burke County*, 303 F.3d 1271, 1275 (11th Cir. 2002). [The decedent] began implementation of his escape before deadly force was applied. His reckless driving preceded any shots, continued as shots were taken, and continued after the shots were fired. Thus, [the decedent's] determination to flee was not a reaction to the force used by Bauer or the other Officers. Instead, [the decedent's] behavior prior to the shots establishes that he had no intention to drive safely regardless of whether shots were fired. Thus, the district court did not err in concluding that it was [the decedent's] reckless driving that caused the death and injury of the plaintiffs and not Bauer's decision to use deadly force.

*Troupe,* 419 F.3d at 1165-66.

would have known, they are not immune from suit and may be held liable for the damage their actions caused. *Harlow v. Fitzgerald*, 457 U.S. 800, 818-19 (1982). But when these same officials make decisions that do not knowingly violate such rights, they are not required to defend themselves in a lawsuit seeking damages. *Id*. They are "immune" from suit. *Id*. We call this defense "qualified immunity" because the official is immune from a damage lawsuit, qualified upon his ability to show that he did not knowingly violate the plaintiff's clearly established constitutional right. *Id*.

*Ray v. Foltz*, 370 F.3d 1079, 1081-82 (11th Cir. 2004). "Qualified immunity operates to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." *Carr v. Tatangelo*, 338 F.3d 1259, 1266 (11th Cir. 2003)(quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)(quoting *Saucier v. Katz*, 533 U.S. 194, 206 (2001)))(internal citations and quotations omitted.).

The Eleventh Circuit uses a two-step analysis to determine whether a public official has qualified immunity: (1) the public official must establish that he was acting within the scope of his discretion; and (2), if the public official establishes that he was acting within his discretion, the plaintiff must show that the public official violated clearly established statutory or constitutional law. *Wood v. Kesler*, 323 F.3d 872, 877-78 (11th Cir. 2003); *Sims v. Metropolitan Dade County*, 972 F.2d 1230, 1236 (11th Cir. 1992).

### i. Scope of Discretion

Rowry contends, "In this case, it is undisputed that all acts taken by Rowry were pursuant to performance of his duties as a police chief and within the scope of his authority. Rowry was in uniform, using his patrol car, and performing police business at the time the

incident occurred." (Doc. 80 at 19.)  Mrs. Bell does not address this issue in her response to

Rowry's Motion for Summary Judgment.  (*See generally* doc. 89 at 26-30.)

"To show entitlement to qualified immunity, the defendant government official must

prove that he was acting within the scope of his discretionary authority when the allegedly

wrongful acts occurred.  Discretionary authority includes all acts of a governmental official

that were (1) undertaken pursuant to the performance of his duties and (2) within the scope

of his authority."  *Woodruff v. City of Trussville*, 434 Fed. Appx. 852, 854 (11th Cir.

2011)(citing and quoting *Jordan v. Doe*, 38 F.3d 1559, 1565-66 (11th Cir. 1994))(citations

and quotations omitted).  Making an arrest was within the scope of Rowry's discretionary

authority as Chief of Police.  *See Sevostiyanova v. Cobb County*, No. 11-13918, 2012 WL

2814394, *2 (11th Cir. July 11, 2012)(citing *Wood v. Kesler*, 323 F.3d 872, 877 (11th Cir.

2003)).

### ii.  Clearly Established Law

Because the court finds no disputed issue of fact as to whether Rowry was acting

within the scope of his discretionary authority, the issue for the court is whether his actions

violated clearly established constitutional law.  This "consists of a two-part inquiry." *Harris*

*v. Coweta County, Ga.*, 433 F.3d 807, 812 (11th Cir. 2005)(citing *Saucier v. Katz*, 533 U.S.

194, 201 (2001)).

> First [the court] ask[s], "[t]aken in the light most favorable to the party
> asserting the injury, do the facts alleged show the officer's conduct violated a
> constitutional right?" [*Saucier*, 533 U.S. at 201]  If, assuming the plaintiff's
> allegations were true, no such right would have been violated, the analysis is

34

> complete.  However, if a constitutional violation can be made out on the plaintiff's facts, [the court] then must determine "whether, at the time of the incident, every objectively reasonable police officer would have realized the acts violated already clearly established federal law." *Garrett v. Athens-Clarke County*, 378 F.3d 1274, 1278-79 (11th Cir. 2004)(citing *Saucier*, 533 U.S. at 201-02).

*Id.* "The threshold inquiry a court must undertake in a qualified immunity analysis is whether plaintiff's allegations, if true, establish a constitutional violation." *Hope*, 536 U.S. at 736.[16] In a civil action brought pursuant to § 1983, the plaintiff bears the burden of demonstrating a constitutional violation. *Harris*, 433 F.3d at 811(citing *Lee v. Ferraro*, 284 F.3d 1188, 1193-94 (11th Cir. 2002)); *Kesler*, 323 F.3d at 877-78.

### A.  Due Process

Mrs. Bell concedes that the Fourth Amendment provides the standard under which her claim of unlawful arrest and excessive force should be analyzed.  (Doc. 89 at 30.)  She states that her "due process claim" is based on the fact that the Fourth Amendment is made applicable to the states through the Fourteenth Amendment.  (*Id.*)

---

[16]The Supreme Court has limited *Saucier's* mandate that a district court **must** decide the question of qualified immunity by deciding first if there has been a constitutional violation.  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)("On reconsidering the procedure required in *Saucier*, we conclude that, while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory.  The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.").

Because Mrs. Bell concedes that she has no separate claim for violation of the Due Process Clause, Rowry's Motion for Summary Judgment as to Mrs. Bell's Due Process claim will be granted and such claim will be dismissed.

B.  Unlawful Arrest

In support of his Motion for Summary Judgment, Rowry contends that Mrs. Bell's Amended Complaint does not contain a claim against him for false arrest.  (Doc. 80 at 29-30.)  Mrs. Bell's Amended Complaint states, "At the Mayor's instructions, Chief Rowry served a non-existing arrest warrant on [Mr. Bell] while he was dining at Church's Chicken," (doc. 4 ¶ 11), and that then-Mayor Mitchell-Gosa "ordered Chief of Police Rowry to arrest [Mr. Bell] illegally since there was no arrest warrant nor a crime being committed in the presence of Defendant Rowry when [Mr. Bell] was shot dead," (*id*. ¶ 22).  However, the "Legal Claims" in Mrs. Bell's Amended Complaint do not include a count against Rowry based on wrongful arrest.  (*See id*. at 4-6.)  The Amended Complaint specifically states, "The injuries suffered by [Mr. Bell] which resulted in his death were the result of an intentional and wrongful act of Chief Rowry in shooting [Mr. Bell] without cause, and constitute an intentional tort," and, "Chief Rowry used excessive force in killing Joe Bell in violation of the Fourth Amendment of the United States Constitution."  (*Id*. ¶¶ 29, 33.)  She makes no specific claim against Rowry based on an unconstitutional arrest, although she does allege that Rowry deprived Mr. Bell of his "liberty interest in bodily integrity and life in violation of the Fourth Amendment."  (*Id*. ¶ 34.)

36

Nevertheless, assuming Mrs. Bell's Amended Complaint can be read to allege a claim based on unlawful arrest, such claim is due to be dismissed because Rowry had arguable probable cause to arrest Mr. Bell.

The law is well established that "[a] warrantless arrest without probable cause violates the Constitution and provides a basis for a section 1983 claim." *Kingsland v. City of Miami*, 382 F.3d 1220, 1226 (11th Cir. 2004)(citing *Marx v. Gumbinner*, 905 F.2d 1503, 1505 (11th Cir. 1990)). However –

> While an officer who arrests an individual without probable cause violates the Fourth Amendment, this does not inevitably remove the shield of qualified immunity. We do not automatically hold an officer liable for making an arrest that, when seen with the benefit of hindsight, turns out not to have been supported by probable cause. . . . Thus, even if we determine that the officer did not in fact have probable cause, we apply the standard of "***arguable probable cause***," that is, ***whether "reasonable officers in the same circumstances and possessing the same knowledge as the Defendant[ ] could have believed that probable cause existed to arrest***." *Lee v. Ferraro*, 284 F.3d 1188, 1195 (11th Cir.2002)(. . . quotation marks omitted). Indeed, ***this is "all that is required for qualified immunity to be applicable to an arresting officer***." *Scarbrough v. Myles*, 245 F.3d 1299, 1302 (11th Cir.2001) (per curiam). This standard recognizes that law enforcement officers may make reasonable but mistaken judgments regarding probable cause but [the standard] ***does not shield officers who unreasonably conclude that probable cause exists***.

*Skop v. City of Atlanta*, 485 F.3d 1130, 1137 (11th Cir. 2007)(original emphasis deleted; emphasis added). "The standard is an objective one and does not include an inquiry in to the officer's subjective intent or beliefs." *Brown v. City of Huntsville*, 608 F.3d 724, 734-35 (11th Cir. 2010). "Whether a particular set of facts gives rise to probable cause or arguable probable cause to justify an arrest for a particular crime depends . . . on the elements of the

crime." *Crosby v. Monroe County*, 394 F.3d 1328, 1333 (11th Cir. 2004).  An arrest which is supported by probable cause but is not permitted under state law does not violate the Fourth Amendment.  *Knight*, 300 F.3d at 1276.

"Probable cause is 'defined in terms of facts and circumstances sufficient to warrant a prudent man in believing that the suspect had committed or was committing an offense.'" *Id.* at 1274 (quoting *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975)).  "Probable cause requires more than a mere suspicion, but not the level of convincing proof necessary to support a conviction."  *Coffin v. Brandau*, 642 F.3d 999, 1007 (11th Cir, 2011)(citations omitted). "Arguable probable cause exists where reasonable officers in the same circumstances and with the same knowledge as the defendant could have believed that probable cause existed." *Id*.

The undisputed evidence shows that Rowry knew Mr. Bell had threatened McGraw on two occasions – once at the newspaper's office and once at the Jr. Food Mart – and that Mr. Bell's threats included obscene language and threats to kill McGraw and to kill any police officer that tried to arrest him.  For the reasons set forth above, the court finds, as a matter of law, that reasonable officers in the same circumstances and with the same knowledge as Rowry could have believed that probable cause existed to arrest Mr. Bell for menacing, stalking, and harassment.

Therefore, to the extent Mrs. Bell has alleged a claim of unlawful arrest in violation

of Mr. Bell's Fourth Amendment rights against Rowry, Rowry's Motion for Summary

Judgment will be granted and such claim will be dismissed.

### c. Excessive Force

"The Fourth Amendment's freedom from unreasonable searches and seizures

encompasses the right to be free from excessive force during the course of a criminal

apprehension." *Oliver v. Fiorino*, 586 F.3d 898, 905 (11th Cir. 2009)(citing *Graham*, 490

U.S. at 394). The right to arrest an individual carries with it the right to "use some degree

of physical coercion or threat thereof to effect it." *Crenshaw*, 556 F.3d 1286, 1290 (11th Cir.

2009)(quoting *Graham*, 490 U.S. at 396).

In determining whether an officer's use of force is excessive, "[t]he question is

whether the officer's conduct is objectively reasonable in light of the facts confronting the

officer." *Vinyard*, 311 F.3d at 1347 (citing *Graham*, 490 U.S. at 394). The reasonableness

of the use of force is measured objectively – that is, the use of force is "judged from the

perspective of a reasonable officer on the scene, rather than with the 20/20 vision of

hindsight." *Graham,* 490 U.S. at 397; *Crenshaw*, 556 F.3d at 1290.

> Because the test of reasonableness under the Fourth Amendment is not capable
> of precise definition or mechanical application, however, its proper application
> requires careful attention to the facts and circumstances of each particular case,
> including [1] the severity of the crime at issue, [2] whether the suspect poses
> an immediate threat to the safety of the officers or others, and [3] whether he
> is actively resisting arrest or attempting to evade arrest by flight.

*Graham*, 490 U.S. at 396 (quoting *Garner*, 471 U.S. at 8 (quoting *Place*, 462 U.S. at 703))(internal citations and quotations omitted).

> The government has a weighty interest in protecting members of the public and police officers from the threat of force. Thus, where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, use of deadly force does not violate the Constitution. As this Court has clarified, the second factor can be reduced to a single question: whether, given the circumstances, the suspect would have appeared to reasonable police officers to have been gravely dangerous.

*Penley v. Eslinger*, 605 F.3d 843, 851 (11th Cir. 2010)(internal citations and quotations omitted).

Viewing the facts in the light most favorable to Mrs. Bell, the non-moving party, the court finds Rowry pulled his weapon and pointed it at Mr. Bell before announcing that he was arresting Mr. Bell. (Doc. 89 at 36.) Mr. Bell stood up from the table and asked what he was being arrested for, and Rowry pushed him. (*Id*.) Mr. Bell pushed back. (*Id*.) Rowry pushed Mr. Bell a second time, then put both hands on his weapon and shot Mr. Bell. (*Id*.)

According to the undisputed evidence, McGraw told Rowry that Mr. Bell had threatened to kill any officer that tried to arrest him. However, viewing the evidence in the light most favorable to Mrs. Bell, Mr. Bell had not physically harmed anyone and, at the time Rowry tried to arrest him, Mr. Bell did not appear to be threatening imminent harm to Rowry or others in the restaurant. Drawing all reasonable inferences in favor of Mrs. Bell, the court assumes, for summary judgment purposes only, that Mr. Bell did not actively resist arrest;

he merely questioned the reason for his arrest.[17]   A reasonable jury could find that, under the circumstances, Mr. Bell would not have appeared to a reasonable police officer to be gravely dangerous such that the use of deadly force to arrest him was reasonable.

Therefore, the court finds a material issue of fact exists as to whether the circumstances surrounding Rowry's shooting of Mr. Bell warranted the use of deadly force.

### iii.  Clearly Established Law

Rowry is not entitled to qualified immunity if, "at the time of the incident, every objectively reasonable police officer would have realized [Rowry's use of deadly force] violated clearly established federal law." *Harris*, 433 F.3d at 812 (citations omitted).  The Eleventh Circuit has held that a plaintiff can establish that the law was clearly established in two ways:

> The first is to point to a materially similar case that has already decided that what the police officer was doing was unlawful.  Because identifying factually similar cases may be difficult in the excessive force context, [the Eleventh Circuit has] recognized a narrow exception also allowing parties to show that the official's conduct lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of case law.  Under this test, the law is clearly established, and qualified immunity can be overcome, only if the standards set forth in *Graham* and [Eleventh Circuit] case law inevitably

---

[17]The court notes that every witness, except Clara Pearce, provided testimony that Mr. Bell pushed Rowry and appeared to grab at his gun or actually grabbed his gun.  The fact that Mr. Bell struggled with Rowry and the fact that he was much larger than Rowry are facts which a fact-finder could conclude support Rowry's use of deadly force.  However, for purposes of summary judgment, this court must resolve the conflicting accounts in favor of Mrs. Bell.

> lead every reasonable officer in the defendant's position to conclude the force
> was unlawful.

*Lee v. Ferraro*, 284 F.3d 1188, 1198 (11th Cir. 2002)(internal quotations and citations

omitted.)

"In the context of Fourth Amendment excessive force claims, [the Eleventh Circuit

has] noted that generally no bright lines exists for identifying when force is excessive; [the

Eleventh Circuit has] concluded that unless a controlling and materially similar case declares

the official's conduct unconstitutional, a defendant is usually entitled to qualified immunity."

*Priester v. City of Riviera Beach*, 208 F.3d 919, 926 (11th Cir. 2000) (citing *Smith v. Mattox*,

127 F.3d 1416, 1419 (11th Cir. 1997)).   The narrow exception to this rule is where the

plaintiff shows that "the official's conduct lies so obviously at the core of what the Fourth

Amendment prohibits," and "was so far beyond the hazy border between excessive and

acceptable force that the official had to know he was violating the Constitution even without

caselaw on point."  *Id.* (citations omitted).   Under either test, "pre-existing law must dictate,

that is, truly compel (not just suggest or raise a question about), the conclusion" that every

like-situated reasonable officer would consider the officer's actions, in question, constituted

a violation of the law.  *Id.*  When reviewing caselaw, in this context, the court is limited to

decisions of the United States Supreme Court, the Eleventh Circuit, or the highest court of

the relevant state that were issued as of the date of the conduct in question.  *Vinyard*, 311

F.3d at 1351-52 and n.22.

Rowry argues, "In the present case, there is no question Rowry believed he could use the force necessary to rebut the full nature of [Mr.] Bell's physical aggression and grabbing of Rowry's gun.  Certainly, it cannot be the law of this circuit that police officers must allow a pending arrestee . . . to resist arrest and take the officer's gun or risk civil liability."  (Doc. 80 at 25.)  Such a statement is obviously true.  However, the summary judgment facts – the facts viewed in the light most favorable to the non-moving party – do not support a finding that Mr. Bell was physically aggressive or that he tried to grab Rowry's gun.  The facts, viewed in the light most favorable to Mrs. Bell, indicate only that Mr. Bell was non-compliant with Rowry's attempt to arrest him and that he pushed Rowry once.

The law is clearly established that such conduct does not warrant the application of deadly force.  *Compare Garner*, 471 U.S. at 11 ("Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so.  . . .  A police officer may not seize an unarmed, nondangerous suspect by shooting him dead.") *with Penley*, 605 F.3d at 851 (police officer used deadly force against a student who appeared to have a gun and refused to drop it despite repeated commands).

Therefore, Rowry's Motion for Summary Judgment as to Mrs. Bell's § 1983/Fourth Amendment/Excessive Force claim, based on qualified immunity, will be denied.

### 2. State-Law Claims

#### a. Claims Barred by Alabama's Wrongful Death Statute

Rowry contends, "All state law claims are abated by the Alabama Wrongful Death Statute." (Doc. 80 at 13.)  The court finds that Mrs. Bell's state-law claims, alleging that Rowry – through some wrongful act or omission – caused Mr. Bell's death, are not claims for personal injury belonging to Mr. Bell.  Therefore, such claims did not abate upon the death of Mr. Bell.  The claims belongs to his estate and are properly before the court.

The law of Alabama is well settled.  A decedent's personal injury claims do not survive his death.  Ala. Code § 6-5-426.  Unless such claims are filed before the death of the decedent, the claims cease to exist.  *Id*.  However, the personal representative of the decedent "may commence an action and recover such damages as the jury may assess . . . for the wrongful act, omission, or negligence of any person, persons, or corporation, his or her or their servants or agents, whereby the death of the testator or intestate was caused."  Ala. Code § 6-5-410(a).  To the extent Mrs. Bell, as the executrix of Mr. Bell's estate, has asserted that Rowry's wrongful act caused Mr. Bell's death, her state-law claims are proper under Alabama's wrongful death statute.[18]

_____

[18]*See Estate of Rowell v. Walker Baptist Medical Center*, Civil Action No. 5:11-CV-3439-CLS-RRA, 2012 WL 2479626, *2-*3  (N.D. Ala. 2012):

> Alabama's Wrongful Death Statute, § 6-5-410, Ala.Code (1975), "vest[s] standing to sue only in the personal representative."  *Tucker v. Molden*, 761 So. 2d 996, 998 (Ala. 2000).  A plaintiff cannot "maintain [a] wrongful death action *until he [is] appointed as a personal representative of [the] estate*."

Therefore, Rowry's Motion for Summary Judgment, to the extent it seeks to dismiss Mrs. Bell's wrongful death claims, will be denied.  However, Rowry's Motion for Judgment will be granted to the extent Mrs. Bell's Amended Complaint can be read to assert the personal-injury claims of Mr. Bell.[19]

### b.  Discretionary Function Immunity, Ala. Code § 6-5-338(a), and State-Agent Immunity

Rowry contends, "Plaintiff's claim for wrongful death . . . should be dismissed as a matter of law because Rowry should be afforded discretionary function ***and*** state-agent immunity.  (Doc. 80 at 14 [emphasis added].)  In Alabama, municipal police officers have state-agent immunity for "conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties."  Ala. Code § 6-5-338(a).  "Since [*Ex*

---

*Buck v. City of Rainsville*, 572 So. 2d 419, 422 (Ala. 1990)(emphasis in original)(under the Wrongful Death Act, claims "must be brought by a personal representative" *Id*. at 423); *Wright v. Woodley Manor Nursing Home*, [No. 2:06-CV-1041-WKW] 2007 WL 841614, *4 ([Mar. 19, 2007] M.D. Ala.) ("Plaintiff does not have standing to bring suit for a 'wrongful death' claim since she is not a 'personal representative' as defined under Alabama law.")[.] Ala. Code § 6-5-462, also known as the Alabama survivorship statute, bars all state law claims other than wrongful death that were unfiled at the time of the plaintiff's death.  Even if the claims had been filed at the time of the plaintiff's death, there still would not be standing since the survivorship statute vests the right to sue only "in favor of and against personal representatives."  Ala. Code. [§] 6-5-462.  The only evidence before the court is that no such personal representative had been appointed at the time of the filing of this action.

*Id*. (emphasis in original).

[19]For example, Mrs. Bell's Amended Complaint asks for compensatory damages. Such damages are available in a personal injury action but not in a wrongful death case.  *See King v. National Spa and Pool Institute, Inc.*, 607 So. 2d 1241, 1248 (Ala. 1992).

45

*parte*] *Cranman*, [792 So. 2d 392 (Ala. 2000),] [the Alabama Supreme Court has] analyze[d] immunity issues in terms of 'State-agent' immunity, rather than 'under the dichotomy of ministerial versus discretionary functions." *Vandenberg v. Aramark Educational Services, Inc.*, 81 So. 3d 326, 338 n.12 (Ala. 2011)(quoting *Howard v. City of Atmore*, 887 So. 2d 201, 203 (Ala. 2003)(quoting *Ex parte Hudson*, 866 So. 2d 1115, 1117 (Ala. 2003))). Therefore, for municipal police officers, there is one source of state-law immunity as set forth in *Hollis v. City of Brighton*, 950 So. 2d 300 (Ala. 2006).

In *Hollis*, the Alabama Supreme court adopted the following statement of the *Cranman* test:

> A State agent shall be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons, or serving as peace officers under circumstances entitling such officers to immunity pursuant to § 6-5-338(a), Ala.Code 1975.

*Hollis*, 950 So. 2d at 309(emphasis and internal quotations omitted).

A municipal police officer claiming immunity "initially bears the burden of demonstrating that he was acting in a function that would entitle him to immunity." *Grider v. City of Auburn*, 618 F.3d 1240, 1255 (11th Cir. 2010)(citing *Ex parte Estate of Reynolds*, 946 So. 2d 450, 452 (Ala. 2006)). If the officer demonstrates that he was acting in such a function, the burden shifts "to the plaintiff to show 'bad intent' – that the officer acted willfully, maliciously, fraudulently, in bad faith, or beyond his or her authority – in order to

defeat the officer's discretionary-function immunity." *Id*. at 1255-56 (citations omitted).

This court has held:

> The Alabama Supreme Court has "held that officers do not have discretion, in the exercise of their judgment, to make an arrest if there is no arguable probable cause." *Mann v. Darden*, 630 F. Supp. 2d 1305, 1317 (M.D. Ala. 2009)(citing *Borders v. City of Huntsville*, 875 So. 2d 1168, 1180 (Ala. 2003)). "[M]uch like making an arrest without arguable probable cause, using an unreasonable amount of force is not within the discretion of an officer." *Id*. at 1318 (citing *Franklin* [*v. City of Huntsville*], 670 So. 2d [848,] 852 [(Ala. 1995)] ["motion for summary judgment should have been granted [in favor of the peace officer defendant] *only* if [plaintiff] presented no substantial evidence to create a genuine issue of material fact as to whether probable cause existed to make a lawful arrest *or as to whether the force used was excessive*" (emphasis added) ].) "While the use of force is typically within the discretion of an officer . . ., the use of unreasonable and egregious levels of force is not." *Id*. Therefore, "if the evidence seen in the light most favorable to [plaintiff] suggests that no reasonable officer could have thought the degree of force was acceptable, then [Hutchins] was not acting within his discretion and is not entitled to discretionary-function immunity." *Id*.

*McElroy v. City of Birmingham*, No. 2:09-CV-0246-SLB, 2012 WL 4711918, *26 (N.D. Ala. Sept. 28, 2012)(footnote omitted).

For the reasons set forth above, the court finds a reasonable jury could find that no reasonable officer could have thought that the degree of force used by Rowry was acceptable. Therefore, the court finds an issue of fact exists as to whether Rowry was acting within his discretion at the time he shot Mr. Bell. Rowry's Motion for Summary Judgment based on his claim of state-agent immunity pursuant to Ala. Code § 6-5-338(a) for excessive force will be denied.

However, because the court finds that Rowry had probable cause to arrest Mr. Bell, Rowry's Motion for Summary Judgment will be granted and his state-law claim based on false arrest will be dismissed.

### 3. Mrs. Bell's Individual Claim for Loss of Consortium

Rowry contends that Mrs. Bell's claim for loss of consortium is due to be dismissed as abated by Mr. Bell's death.  (Doc. 80 at 32-33.)  Mrs. Bell does not oppose Rowry's Motion for Summary Judgment as to this claim.  (*See generally* doc. 89.)

According to Alabama law,

> The wife's right of consortium is her separate right.  Although her injury derives out of her husband's injury, her claim is independent of his.  The wife's separate action for loss of consortium is not an action for the same cause against the defendant.  It is distinct from the husband's personal injury or wrongful death claim and does not abate upon the death of the husband.

> The wife's right of recovery depends only upon a showing of liability on the part of third-party Defendants.  To make her case, she simply must prove that her husband's injury was caused by Defendant's wrongful acts and that, as a result, she lost her husband's consortium ***from the time of the injury until his death***.  The fact that there may be some impediment to bringing a wrongful death or personal injury action does not mean there is any impediment to her bringing her loss of consortium claim.  Thus, it is irrelevant that a claim on his behalf, whether for wrongful death or personal injury, may fail under provisions of a particular act.

*Zimmerman v. Lloyd Noland Foundation, Inc.*, 582 So. 2d 548, 551 (Ala. 1991)(internal quotations, citations, and original emphasis omitted; emphasis added).

Mrs. Bell's loss of consortium claim is not based on any injury she suffered between Rowry's shooting of her husband and her husband's death.  She claims loss of consortium

damages based on Mr. Bell's death; she claims "financial support of [herself] and children *if he had lived*," and "loss of society and companionship of the deceased."  (Doc. 4 at 6 [emphasis added].)   These types of consortium damages are not allowed based on the death of Mrs. Bell's husband.

Rowry's Motion for Summary Judgment on Mrs. Bell's claim for loss of consortium will be granted and this claim will be dismissed.

## C.  CONCLUSION

For the foregoing reasons, the court is of the opinion that there are no material facts in dispute and Rowry is entitled to judgment as a matter of law on Mrs. Bell's individual claim for loss of consortium, her state-law claims based on false arrest, her federal claims based on denial of due process and unlawful arrest, and Mr. Bell's personal injury claims. Rowry's Motion for Summary Judgment is denied as to Mrs. Bell's state-law wrongful death claims and §1983 claim based on Rowry's alleged use of excessive force.  An Order granting in part and denying in part Rowry's Motion for Summary Judgment will be entered contemporaneously with this Memorandum Opinion.

## IV.  CITY OF YORK'S MOTION FOR SUMMARY JUDGMENT

## A.  STATEMENT OF FACTS

The court adopts the Statement of Facts set forth above in Section II.A.

## B. DISCUSSION

### 1. Federal Claims

#### a. Rowry as Final Policymaker for the City

To the extent the City's Motion for Summary Judgment asks the court to dismiss Mrs. Bell's § 1983 claims against it based on the fact that Rowry was not a final policymaker for the City, its Motion for Summary Judgment as to this claim is due to be denied as moot. Previously, this court denied Mrs. Bell's Motion for Leave to Amend to add such a claim. (*See* doc. 104.)  Therefore, because this case does not concern any § 1983 claim basing municipal liability on the decisions of Rowry as a final policymaker, the City's Motion for Summary Judgment as to this claim will be denied as moot.  *See  Walters v. City of Andalusia*, 89 F. Supp. 2d 1266, 1285 (M.D. Ala. 2000)("However, the court cannot grant summary judgment on a nonexistent claim as requested by the City Defendants.  Rather, the court finds that the City Defendants' Motion For Summary Judgment on Plaintiff's state law claims is due to be denied as moot.").

#### b. Failure to Train or Supervise

The City argues that it is entitled to summary judgment on Mrs. Bell's § 1983 claim based on a failure to train and/or supervise Rowry.  (Doc. 78 at 21.)  It argues:

> [A] municipality will be held liable for an employee's constitutional violations only where "the municipality inadequately trains or supervises its employees, this failure to train or supervise is a city policy, and that city policy causes the employees to violate a citizen's constitutional rights."  *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998)(citing *City of Canton* [*v. Harris*], 489 U.S. [378,] 389-91 [(1989)]).   A municipality can be held liable on a

50

failure-to-train or failure-to-supervise theory only if those in supervisory positions fail to supervise subordinates in such a manner as to demonstrate "deliberate indifference" to the constitutional rights of citizens. *City of Canton*, 489 U.S. at 388. Plaintiff cannot meet this burden.

A plaintiff can show that a municipality was deliberately indifferent to the need for increased supervision or training by demonstrating (1) a "pattern of constitutional violations . . . such that the municipality knows or should know that corrective measures are needed," *Young v. City of Augusta*, 59 F.3d 1160, 1172 (11th Cir. 1995), or (2) that the "violation of federal rights . . . [was a] highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations." [*Board of County Commissioners of Bryan County*] *v. Brown*, 520 U.S. [397,] 403 [(1997)].

To put a municipality on notice that more or different supervision or training is required, past incidents must show a pattern of "widespread prior abuse." *Wright v. Sheppard*, 919 F.2d 665, 674 (11th Cir. 1990). Thus, the City is not automatically liable under § 1983 even if it inadequately trained or supervised its police officers and those officers violated Plaintiff's constitutional rights. The Supreme Court has explained that there are only "limited circumstances" in which an allegation of a failure to train or supervise can be the basis for liability under § 1983. Since a municipality rarely will have an express written or oral policy of inadequately training or supervising its employees, the Court has further explained that a plaintiff may prove a city policy by showing that the municipality's failure to train evidenced a "deliberate indifference" to the rights of its inhabitants, as follows:

> "We hold today that the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact. This rule is most consistent with our admonition . . . that a municipality can be liable under § 1983 only where its policies are the 'moving force [behind] the constitutional violation.' Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983 . . . . '[M]unicipal liability under § 1983 attaches where – and only where – a deliberate choice to follow a course of action is made from among various alternatives' by city policymakers. Only where a failure to train reflects

> a 'deliberate' or 'conscious' choice by a municipality – a 'policy' as defined by our prior cases – can a city be liable for such a failure under § 1983.

*City of Canton*, 489 U.S. at 388-89 (internal citations omitted).

To establish a "deliberate or conscious choice" or such "deliberate indifference," a plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action. *See* [*Brown*], 520 U.S. at 408-09; [*Young*], 59 F.3d [at] 1171-72 . . . . The Eleventh Circuit repeatedly has held that without notice of a need to train or supervise in a particular area, a municipality is not liable as a matter of law for any failure to train and supervise. In *Wright v. Sheppard*, 919 F.2d 665 (11th Cir. 1990), the Eleventh Circuit held that a sheriff's department was not liable for a deputy's acts when "no evidence of a history of widespread prior abuse . . . put the sheriff on notice of the need for improved training or supervision." *Id*. at 674. See also, *Church v. City of Huntsville*, 30 F.3d 1332, 1342-46 (11th Cir. 1994)(no proof that the City was aware of a prior incident in which constitutional rights were similarly violated).

Therefore, for the City of York to be liable, the Plaintiff must show that the City knew that corrective measures were needed and refused to apply the corrective measures, or that the violation of federal rights was highly predictable. Plaintiff cannot make either of these showings. As set forth above, no evidence of any "similar acts" by Defendant Rowry has been educed through discovery or presented by Plaintiff. Plaintiff here cannot point to even a single occurrence of Defendant Rowry allegedly attempting an arrest without probable cause or using excessive force, a citizen complaint, or any other incident of misconduct while acting as a police officer in the course of an arrest. Without any evidence whatsoever, there likewise can be no "knowledge" by the City of misconduct or of a need for improved training or supervision. Accordingly, there is no basis for a claim under §1983 on a theory of failure to train or supervise by the City of York.

(Doc. 78 at 21-24 [emphasis omitted].)  Mrs. Bell does not address defendant's argument.

(*See generally* doc. 89 at 10-23 [arguing that Rowry was a policymaker; not addressing

City's argument related to the § 1983 hiring and training claims].)

The Supreme Court has held that "[o]nly where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *City of Canton v. Harris*, 489 U.S. 378, 389 (1989). "Deliberate indifference is a stringent standard of fault requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick v. Thompson*, 131 S. Ct. 1350, 1360 (2011)(quotations and citations omitted).

Nothing in the record indicates that Rowry posed an obvious risk to violate citizen's constitutional rights to be free from unreasonable seizures – such as past incidents of use of excessive force or arresting people without probable cause. Indeed, the only write-ups he received were for insubordination as a deputy with the Sumter County Sheriff's Office. His record as an officer and as the Chief of Police in York contains no indication that Rowry would attempt to arrest a citizen without probable cause or use excessive and deadly force to arrest a citizen. Mrs. Bell has not responded to the City's Motion for Summary Judgment with any evidence showing that the City was deliberately indifferent to an obvious consequence of hiring, training, supervising, and/or retaining Rowry, and she has not provided any evidence that the alleged negligent hiring and/or retention or inadequate training and/or supervision actually caused Rowry's violation of Mr. Bell's Fourth Amendment right to be free from unreasonable seizure. *See Connick*, 131 S. Ct. at 1358.

Therefore, the City's Motion for Summary Judgment as to Mrs. Bell's § 1983 claims based on hiring, training, supervision, and/or retention is due to be granted and such claims will be dismissed.

### 2. State-Law Claims

#### a. Personal Injury Claims Abated

The City contends that Mrs. Bell's state-law claims based on the negligent hiring, training, supervision, and/or retention of Rowry "were extinguished [by] the death of Plaintiff's decedent, Joe Louis Bell." (Doc. 78 at 11-12 [citing, *inter alia*, Ala. Code § 6-5-426].) It argues, "Plaintiff's recovery and cause of action under state law is limited solely to that available under Alabama's Wrongful Death Act, § 6-5-410." (*Id*. at 12.)

The law of Alabama is well settled. A decedent's personal injury claims do not survive his death. Ala. Code § 6-5-426. Unless such claims are filed *before* the death of the decedent, the claims cease to exist. *Id*. Therefore, the City's Motion for Summary Judgment, to the extent it seeks to dismiss Mrs. Bell's wrongful death claims based on the City's alleged negligent hiring, training, supervision, and/or retention of Rowry on the ground that such claims were abated by Mr. Bell's death, will be denied. However, the City's Motion for Judgment will be granted to the extent Mrs. Bell's Amended Complaint can be read to assert the personal-injury claims of Mr. Bell based on negligent hiring, training, and/or supervision.

### b. Respondeat Superior

The City contends that it has immunity from state-law claims based on Rowry's intentional conduct under Ala. Code § 11-47-190.  (*See* doc. 78 at 13.)  The City may only be liable under Ala. Code § 11-47-190 if Rowry is not entitled to immunity under § 6-5-338(a).[20]   As set forth above, the court finds that Rowry is not entitled to immunity as to Mrs. Bell's claim based on Rowry's use of excessive force; however, he is entitled to immunity as to her false arrest claim.  Therefore, the City has immunity under § 6-5-338(b) for Mrs. Bell's false arrest claim and its Motion for Summary Judgment as to that claim will be granted.  However, the City does not have immunity pursuant to Ala. Code § 6-5-338(b) from Mrs. Bell's state-law tort claim based on Rowry's alleged use of excessive force.

The City argues:

> Plaintiff repeatedly alleges that "the shooting of Joe Louis Bell was an intentional tort". [(Doc. 4 ¶¶ 1, 23, 27, 29.)]  Accordingly, the City is immune from suit as to Plaintiff's state law tort claims.  *Brown v. City of Huntsville*, 608 F.3d 724, (11th Cir. 2010)(City immune from liability for officer's alleged intentional use of pepper spray on driver).  As a matter of law, the City cannot be held liable for an intentional tort perpetrated by Defendant Rowry and the claims against the City of York should be dismissed.

(Doc. 78 at 13-14.)  It contends it is entitled to immunity based on Ala. Code § 11-47-190, which provides:

---

[20]Section 6-5-338 "is intended to extend immunity only to peace officers and governmental units or agencies authorized to appoint peace officers."  Ala. Code § 6-5-338(b).  Therefore, if the police officer is immune pursuant to Ala. Code § 6-5-338(a), the City is immune pursuant to § 6-5-338(b).  *See Brown v. City of Huntsville*, 608 F.3d 724, 742-43 (11th Cir. 2010).

> No city or town shall be liable for damages for injury done to or wrong suffered by any person or corporation, unless such injury or wrong was done or suffered through the ***neglect***, ***carelessness*** or ***unskillfulness*** of some agent, officer or employee of the municipality engaged in work therefor and while acting in the line of his or her duty . . . .

Ala. Code. § 11-47-190 (emphasis added).  "As 'unskillful' is used in § 11-47-190, it means lacking in skill or proficiency."  *City of Birmingham v. Thompson*, 404 So. 2d 589, 592 (Ala.1981)(internal quotations omitted).  "Where a plaintiff alleges a factual pattern that demonstrates neglect, carelessness, or unskillfulness, the plaintiff has stated a cause of action under Section 11-47-190." *Hardy v. Town of Hayneville*, 50 F. Supp. 2d 1176, 1191 (M.D. Ala. 1999).

Mrs. Bell's Amended Complaint alleges that Rowry acted "willfully, maliciously, in bad faith, and/or beyond his authority as Chief of Police."  (Doc. 4 ¶ 19.)  She also alleges, "Chief Rowry's intentional, reckless, ***negligent*** and wrongful acts contributed to the death of [Mr.] Bell," (*id*. ¶ 27 [emphasis added]), and, "The acts and inactions of Chief Rowry were wrongful and constitute ***negligence*** under Alabama common law," (*id*. ¶ 32 [emphasis added]).  To the extent Mrs. Bell's Amended Complaint can be read to allege that Rowry acted negligently or unskillfully in using excessive force that caused the death of Mr. Bell, the City's Motion for Summary Judgment, seeking to dismiss Mrs. Bell's state-law claims based on immunity under Ala. Code § 11-47-190, will be denied.[21]  If Rowry is found to have

---

[21]The court notes that the City did not argue that the record evidence, as opposed to Mrs. Bell's allegations in her Amended Complaint, either negates an element of her negligence claim or "demonstrate[s] that the party bearing the burden of proof at trial will

caused the death of Mr. Bell through negligence or unskillfulness, the City could be vicariously liable.[22]   However, its Motion for Summary Judgment will be granted to the extent Mrs. Bell's claims are based on Rowry's intentional, willful, and/or malicious use of force that caused the death of Mr. Bell.

### c. Negligent Hiring, Training, Supervision, and/or Retention

The City argues that, as a matter of law, it is immune from liability for negligent hiring, training, supervision, and/or retention because "Alabama does not recognize an action against a municipality for its supervisors' negligent hiring, supervising, and training of a subordinate under state law." (Doc. 78 at 15 [citing, *inter alia*, *Styron v. City of Foley*, 2005 WL 3098926 (S.D. Ala. 2005)].)   Recently, this court addressed similar state-law claims of negligent training and/or supervision:

> [M]unicipal liability under Section 11-47-190 is based on the doctrine of respondeat superior." *Ott v. City of Mobile*, 169 F. Supp. 2d 1301, 1314 (S.D. Ala. 2001)(citing *City of Lanett v. Tomlinson*, 659 So. 2d 68, 70 (Ala. 1995))(alteration supplied).  Before a city can be liable under that doctrine, one or more of its employees must be liable for a tort.  *Id.*

> Under Alabama law, one element of the tort of negligent supervision or training of an officer is the existence of a master-servant relationship between the officer and his supervisor.  *See Ott*, 169 F. Supp. 2d at 1314.  As a result,

_____

not be able to meet that burden." *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).

[22]*See Byther ex rel. Byther v. City of Mobile*, 398 F. Supp. 2d 1222, 1233 (S.D. Ala. 2005)("A municipality can be held liable 'where the officer committing the alleged assault or battery was unskilled as a consequence of inadequate training or supervision of the municipality.'" (quoting *Nolin v. Town of Springville*, 45 F. Supp. 2d 894, 914 (N.D. Ala. 1999), *reversed on other grounds* 207 F.3d 1253 (11th Cir. 2000))).

a plaintiff who seeks to sue a municipality for negligent training or supervision "must show that Alabama law recognizes a cause of action against a supervisory employee for the negligent training or supervision of a subordinate:" *e.g.*, the police officer accused of misconduct. *Id.*

However, a supervisor "is not the master of a subordinate, nor is the subordinate the servant of the supervisor; rather, as Alabama cases make plain, the status of 'master' is restricted to one who is actually or essentially the employer of the servant." *Ott*, 169 F. Supp. 2d at 1314 (citing *Tyson Foods, Inc. v. Stevens*, 783 So. 2d 804, 806 (Ala. 2000); *Hauseman v. University of Ala. Health Servs. Found.*, 793 So. 2d 730, 732 (Ala.2000)). Thus, as in *Ott*, this court is "satisfied that no such cause of action exists." *Id.*

Further, assuming the presence of a master-servant relationship, employer liability for negligent supervision or training also "requires, among other elements, proof of the employer's actual or constructive awareness of the employee's incompetency." *Ott*, 169 F. Supp. 2d at 1315 (citing *Big B, Inc. v. Cottingham*, 634 So. 2d 999, 1002 (Ala. 1993)). This court does not find that either element exists in this case.

*Crutcher v. Vickers*, Civil Action No. CV-10-S-01176-NE, 2012 WL 3860557, *12-*13

(N.D. Ala. Sept. 5, 2012)(Smith, J.)

Because the City is only liable under § 11-47-190 for the negligent torts of its employees and its employees cannot be liable under state-law for negligent hiring, training, supervision, and/or retention, such claims are due to be dismissed against the City. Moreover, even if the City's employees could be liable for negligent hiring, training, supervision, and/or retention, nothing in the record before this court indicates that the City or its employees had knowledge or notice that Rowry was incompetent at any time before the shooting. Therefore, the City's Motion for Summary Judgment as to Mrs. Bell's state-law

claims based on the alleged negligent hiring, training, supervision, and/or retention of Rowry is due to be granted and such claims will be dismissed.

## C. CONCLUSION

For the foregoing reasons, the court is of the opinion that there are no material facts in dispute and the City is entitled to judgment as a matter of law as to Mr. Bell's personal injury claims, if any, and Mrs. Bell's federal and state-law claims based on allegations of false arrest and negligent hiring, training, supervision, and/or retention. However, the City's Summary Judgment Motion will be denied as to Mrs. Bell's wrongful death state-law claim against the City based on Rowry's negligent or unskilled use of excessive force, and denied as moot as to Mrs. Bell's § 1983 claims based on Rowry as a final policymaker. An Order granting in part and denying in part the City's Motion for Summary Judgment will be entered contemporaneously with this Memorandum Opinion.

## <u>CONCLUSION</u>

For the foregoing reasons, the court is of the opinion that there are material facts in dispute, and (1) the plaintiff is not entitled to judgment as a matter of law; (2) defendant City of York is not entitled to judgment as a matter of law as to plaintiff's state-law, wrongful death  claim based on Rowry's negligent or unskilled use of excessive force; and (3) defendant Rowry is not entitled to judgment as a matter of law as to plaintiff's federal and state-law claims based on the use of excessive force. Defendant City of York's Motion for Summary Judgment as to plaintiff's claim that Rowry acted as the City's final policymaker

will be denied as moot.  Also, the court finds there are no material facts in dispute and defendants are entitled to judgment as a matter of law on all other claims.  An Order denying plaintiff's Motion for Partial Summary Judgment, (doc. 75), granting in part and denying in part defendant City of York's Motion for Summary Judgment, (doc. 78), and granting in part and denying in part defendant Rowry's Motion for Summary Judgment, (doc. 79), will be entered contemporaneously with this Memorandum Opinion.

**DONE**, this 29th day of March, 2013.

*Sharon Lovelace Blackburn*
SHARON  LOVELACE  BLACKBURN
CHIEF UNITED STATES DISTRICT JUDGE